May it please the court, Barry Kramer on behalf of plaintiffs and owners. This case, I believe, is one literally about common sense. What you have is you have a credit card customer. He receives an account agreement that says, if we increase your rates, we will give you notices required by law. And the law specifically here says that if we increase your rates as a result of a default, then you must give notice of that increase before it goes into effect. And essentially what Chase did was they would not only not give notice, but at the end of a month, where you were operating one month after another, at the end of the month, they review the account, then they say, well, there's been a default here, and we're going to increase this person's rates, and they set the rate increase back a full month. So a person automatically can never get notice before the rate increase goes into effect. Now Chase comes along, and after doing this for a period of years, says, well, our card member agreement gives you the notice of your rate increase. And the whole concept is ridiculous. But you end up with a situation where Chase is trying to justify his actions by coming up with a series of arguments that are all really silly arguments, and I'll go over them relatively briefly. The first thing is the interpretation of the regulation itself. We're talking about 226.9C1. The regulation itself is as clear as a bell. If you have a rate increase as a result of a default, you have to give notice before it goes into effect. This is what's known colloquially as Regulation Z? It's in Regulation Z. It's part of it. Regulation Z has a series of regulations. But it's part of it. Yes, it's part of it. Now, the regulation itself effectively has the effect of law, even though it's a regulation put out by the Federal Reserve Board. The commentary to that regulation also, in a sense, has the effect of law. And for this one regulation that says you must give notice, there's two comments that are involved here today. The first comment is what I call Comment 3. That's labeled timing, as I recall. Timing, yes. So it controls timing. Right. I don't see where it controls the issue that you're talking about. Well, okay, but the regulation says that you need to give notice of an increase on or before its effective date. The commentary says written notice required. Under the third section, timing, advanced notice is not required. That means 15 days is what's called advanced notice by the board. So 15 days advanced notice is not required. Advanced notice of 15 days is not necessary. That is, a notice of change in terms is required, but it may be mailed or delivered as late as the effective date of the change in two circumstances. And the circumstance we're concerned with is if there is an increased periodic rate or any other finance charge attributable to the consumer's delinquency or default. That's what we have here. We have a delinquency or a default, and you have to give notice according to this before the effective date, or in this case it says as late as the effective date, if there is this default. So the comment... Does this comment include the word specific? No, this does not. This comment, I'll read it to you. A notice of change in terms is required, but it may be mailed or delivered as late as the effective date of the change in two circumstances. If there is an increased periodic rate or any other finance charge attributable to the consumer's delinquency or default. It doesn't have the specific. That's a bunch of garbage. This doesn't get into the specific, non-discretionary. All of that is Chase's rhetoric trying to invoke some non-applicable comment. This comment applies to a rate increase that occurs as a result of a default, and it's the only comment that has this... Well, it determines its timing, but I'm not sure that it determines anything else. Well, okay, but it does say in case that you have... You know, if it says you need to give a notice by such and such time, I would say that it's also saying that you must give a notice. I mean, the two go together. It says a notice of change in terms is required. It says a notice is required as well as when it has to be given. So I... The regulation comment three is crystal clear. The dicta from the request for public comment I'll talk about at the end here. But these... The regulation itself and comment three both state unequivocally that you need to give notice before the effective date of this increase going into effect. Now, comment one is the other comment involved. Comment one is not applicable by its terms to a default situation. It has two requirements to come within comment one, and comment one stands as an exception. One of the requirements says that a plan has to give the specific terms of a rate increase. Comment two says... I mean, the second part of it, there's no discretion. Let me give you an example. You get your credit card. It says your introductory rate is 0% for the next six months. Then it goes to the standard rates after your statement date in May or whatever. This is a specific statement of what's going to happen. No further notice needs to be given because of comment one. Comment one was designed to make it easier on the banks for something like a variable rate increase, which says your rate goes up or down with the prime rate. The bank doesn't need to give you a notice every time the prime rate changes. Or another example given is where a person has a special rate because he's employed with the bank. If he loses his employment, his rate goes up. A third example given in comment one is where you have a certain requirement to maintain a savings balance. It's sort of like a CD. If your balance is below a certain rate, your rate goes up. Those are the examples. You need a very specific rate increase agreement. There can be no discretion. Now, if you go to the situation where you take a look at Chase's default terms, which they're based on, what do they say? On each monthly review, we may change your interest rates up to a certain maximum. If you do not meet all these conditions, your account may lose its preferred rates. We may obtain consumer credit reports. We may use the reports, establishing the non-preferred rate that may apply to your account. Now, Chase has hundreds of attorneys, I assure you. They know the difference between may and will. They do not tell you that we will increase your rates. They don't say anything about that. Most of the time, with the default, they don't increase your rate. So the question is, is this giving the specific terms of a rate increase? Well, what does the court say about it? The court says Chase lists the specific acts, great, the specific acts, the default, that might result in higher rates. If it might result in higher rates, it might not result in higher rates. The court is using this fudged term. The court says might, Chase says may. Either way, it's the same difference. May, might. It might happen, it might not. That's not the specific terms of a rate increase. And, indeed, nobody knows about the rate increase. The concept of a card member agreement giving you the specific terms for a rate increase when it's based on a default and it might occur or it might not occur, the concept is ridiculous. You've got to only support that by talking and talking and talking and confusing the judge, which Chase, due to excellent briefing, has done. It's confused most of the judges, not all of them. Well, it's convinced all of them, I think. No, it has not. I've got a ruling from Judge George O'Neill in the Shainer case in Massachusetts. He withdrew that, though, I believe. No, he did not. What he did do is this. The judge said four things. He said in light of what the Federal Reserve has now done, he... He did not withdraw this. Well, I have a conclusion to that. Fine. I understand what you're saying, and you're right to an extent. He said, and it's very important, he said, Chase says the common three does nothing more than repeat the language from 226.9c1. Let me get to his ruling because he had four elements to his ruling. He says that this is the regulation that applies. He says common three applies to this situation, and it requires notice. He says common one doesn't apply because there's the possibility of a nonspecific discretionary change. He says if there's any ambiguity between common one and common three, common three is the one that controls because common three is specific to a rate increase. Then he turned around and said, however, the Federal Reserve Board has put out whatever, and he was confused with that issue, and he says, well, I'll have to go with the Federal Reserve Board. I will talk to you about that in a minute. But as far as his interpretation of what the regulations state, his regulations said these other courts are all wrong, and that's about four or five judges that have ruled on this issue, and they've all copied Judge Conte in the Evans case. They've literally parroted the wording, and Judge Conte, he said that you have comment three, but comment goes on to hold, and he reverses the order mistakenly in the commentary. He got the comments backwards. You have comment one first, then comment three. If Judge Conte had got the order correctly, he wouldn't have been able to say, well, this one, because it comes after, is an exception to the other one. So you have a situation where I can tell you this, and if you look at it like this, if you took these terms that appear in Chase's contract and you read them off to 100 people, you show this to 100 people, there would be 100 out of 100 says, that would say Chase did not give me the specific terms of a rate increase. It said it might do it, it might not. How is that the specific terms? The fact that Judge Conte looks at it and says, well, it gave you the specific terms because it defines a default, or it gave you the specific terms because it says what the maximum rate can be, that is simply nonsense. Judge Conte was just wrong. And you know, let me tell you something. You're not helping yourself by referring to Conte or other judges as just wrong, he got deceived, he reversed this. You know, we know all these judges. So where does that get you? I mean, you don't really show any respect for them in your arguments. You know, you got to, I mean, I don't think you could make it into the State Department as a diplomat. Listen, Your Honor, I respect what you're saying. I will promise not to do that again. I mean, I know Sam. I know the way he thinks. He's not stupid. No, he's not. And that doesn't mean I agree with him all the time. But if you spoke about him and he were here, you'd regret it. Please accept my apologies. I will definitely try not to do that again. It's a state of frustration that's overwhelming. I can understand that. But regardless, I will definitely. Be nicer. Definitely be nicer. Yeah. So let me move on because I do think that. Let me ask you this. Sure. There's a formula that Chase was using. Was that formula made known to the cardholders? No, Chase, as a matter of fact, Chase says in their brief that there's no requirement for us to give us, give you guys the formula. There's no requirement in Regulation Z. Our formula is proprietary. You can ask Chase about that if they give the formula. I'd appreciate if you did as to their rate increases to their customers. All they give to the customers and all their motion is based on is this card member agreement that says we may do this and we may do that. Now, they've convinced some judges that that's giving the specific terms. But I think if you ask that question to 100 people, they'd all say the same thing, that that's not specific. Also, their agreement is fully compatible with a rate increase being given every time there's a default and with a rate increase being never. Now, an agreement that's compatible with both directions, 100 percent, can't be giving the specific terms for the rate increase. And I'd like to then address, which was raised. You know, I think it times up for now. I think you gave me 15 minutes. I'm not sure. Then we put 15 down. We put 15 down. Okay. I just want to talk quickly about it. You don't want us to raise our rates, do you? They will raise your rates. That's the problem. You get your credit card and you find out that your rate is 32 percent. Those are the people that contact me. It was 8 percent. Now it's 32 percent. And it went into effect a month ago, and it's too late to. But, listen, you know, we'll give you some time for rebuttal. But, you know, you've got your briefs. We've studied all of that. So just have a seat for a minute. Okay, sure. Let's see what the Chase people have to say. Good morning, Your Honors. Nancy Thomas from Morrison & Forster on behalf of Appellee Chase Bank. Where I want to start here is that the Board has provided, the Federal Reserve Board has provided its interpretation here. Comment one provides that there's no need for additional notice where the specific change is set forth initially in the card member agreement. And as appellant's counsel has conceded and the Supreme Court has long held, the Board's interpretation is dispositive here. Doesn't that, doesn't comment one also say, in contrast, notice must be given if the contract allows the creditor to increase the rate at its discretion but does not include specific terms for an increase? Yes, it does, Your Honor. And the reason why that last sentence doesn't apply here is Chase does have discretion, but it does, it also sets forth the specific terms for the increase, which are the circumstances constituting default and the maximum default interest rate. No, no, no. The paragraph is entitled, changes initially disclosed. And then it runs through a specific list. For example, a disclosed variable rate plan, the circumstance where someone has a special rate because they're an employee of the bank and the employment ceases, or where they're required to keep a certain amount in a savings account and it dips below that required amount. Those are specific examples of where no notice is required. But it goes on to say, in contrast, if it's discretionary and it's up to the bank to do it, you have to give notice. Isn't that what it says? Your Honor, no. What it says is if it's discretionary and the specific terms are not set out. And the example there is a reservation of rights clause, which is simply a clause that says the creditor reserves the right to increase your interest rate at any time for any reason. There, the specific triggering events are not set out. Let me give you another common-sense example of why it is that the discretion ---- Show me where a discretionary rate increase where it's disclosed in advance what the amount or percentage is. I'm sorry. I thought you had told me that this carve-out from charges initially disclosed, which I quoted to you, doesn't apply because Chase actually tells people what the rate is. Yes, Chase does. Is that what you're saying? No. It's because Chase discloses the specific terms, which are the circumstances constituting default, the triggering events. And here, too, in each of those examples of where notice need not be given, the triggering event, for example ---- But do you tell the cardholder what the rate is? Indeed, we do, Your Honor. default interest rate is disclosed in the pricing schedule. So the cardmember ---- It's the maximum. It isn't the actual rate. That's right. It is the maximum. So the cardholder knows the worst that can happen to them. And what I want to do is give you a ---- But you don't always ---- Chase doesn't always charge that. That's right. But the discretion is only downward. So, for example, if you take appellant's view of this comment, then if Chase ---- Well, if the cardmember agreement provided, Chase will always increase your interest rate upon default. That would not require further notice. But here, where Chase has discretion, but can only exercise its discretion to do less than the maximum, in other words, to act in the cardmember's favor ---- What's the maximum, though? You know what, Your Honor? It is not in the record what the maximum is. And I do not know what the maximum default interest rate was for Mr. McCloy. But there's no dispute between the parties that there is a pricing schedule that would have gone along with the change in terms notice, which sets forth the agreement terms. I thought I remember something like 36 percent. And, Your Honor, what that comes from is in the Second Amended Complaint, there are a couple of allegations about four examples that Appellant's counsel has just made up. If you look at the Second Amended Complaint, there are absolutely no allegations in it about what happened to Mr. McCloy. And there's nothing in the Second Amended Complaint that identifies what his maximum is. Kennedy. Why did you say that the product of Appellant's counsel created mine? As if he just made it up. Well, because if you look at the Second Amended Complaint, it says, for example, if the rate increase were 10 percent, if the interest rate were 10 percent and then there would be a total of $125 of extra interest each month. But those are all, there are two places in the Second Amended Complaint where it states that, and they're all done as a for example. This is a Rule 12b6 dismissal, isn't it? It is, indeed, Your Honor. So if there's, by any stretch of the imagination, if there's something in the complaint that would state a claim, we're obliged to send it back? Factual allegations, I would have to agree with you. These are not factual allegations about what happened to Mr. McCoy or anybody else. What they say is for example. And they're illustrations of how the practice works. There's nothing in there that indicates they are factual allegations that had ever happened to anybody. Regardless, though, Your Honor, there's no challenge here to the maximum default interest rate, the level of that interest rate increase. Nor could there be, Your Honor, because of Federal preemption. And through the National Bank Act, Delaware banking law sets the terms for Chase's interest rate practices. And under Delaware law, whatever is provided in the agreement is authorized under Delaware law. So getting back to where we. Say that again. You lower your voice. Sorry. Under Delaware banking law, under the National Bank Act, there's a concept of A National Bank Act may export throughout the country whatever interest rates are authorized in its home state. You mean they charge? Yes. They may charge interest at whatever rate is authorized in their home. That's like when they kill fish, they say they're harvesting them. Okay? I got it. So under the Delaware Banking Act, whatever interest rate is agreed to in the card member agreement is the interest rate, is an interest rate that's authorized. And here there's no dispute. Appellant does not contend that Chase charged an interest rate above the maximum default interest rate. Well, the fact is you have the discretion to charge anywhere between zero and the maximum rate, right? Yes. And that's where I would get back to the common sense. So that's disclosure? Yes, Your Honor. The card member knows the worst that can happen to them. They know, let's say the maximum default rate is 20 percent. The card member knows that the card member knows they paid late. And when they do that, they know that the consequence could be an interest rate increase from their preferred rate to 20 percent. If Chase here provided that the interest rate increase was mandatory, there's no way in which that would be better for the consumer than what's the practice that Chase actually does, which is you know the worst that can happen. The only discretion that Chase can exercise is downward discretion, to do less than what's expressly set out. Well, Wendy, you know, I get these all the time. And, you know, I'm very tempted when I get it and they say, you sign this and you'll have $50,000 in credit, you know. And then my wife takes it away and she cuts it with a scissor, see. But when you get those, I probably get about one a week. Does it tell me when I open that up what the maximum default rate is? If you, does it? In fact, it does. Right on the little ad, you know, when you open up and they tell you congratulations and all that. And, in fact, there's something called the Schumer box, which is a box, a tabular form, and it will state the maximum default rate. But what I want to get back to here is. Is that named after the senator? It was, indeed, Charles Schumer who put the requirement into the Truth in Lending Act and then into Regulation Z. But what I want to get to here is the proposed rules, because appellant's position. So let's start out. The proposed rules in 2007, the board specifically provided that the interest rate increase at issue here is covered by Comment 1. And although appellant's counsel would have you call those mere dicta, in fact, a long line of Supreme Court cases and subsequent Ninth Circuit authority says otherwise. To the extent that the court finds that the meaning of the commentary is not entirely clear from its face, then the board's informal interpretation is controlling. And the site for that, Your Honors, is Auer, A-U-E-R v. Robbins, 519 U.S. 452. When did the board issue that notice? The board first stated this in the advance notice of proposed rulemaking in 2004 and then said exactly the same thing again in the proposed rules, which it issued in June of 2007. So that notice has been in existence apparently when all these decisions were made by various courts. Is that correct? Yes, Your Honor. And the courts that, especially for the 2007 proposed rules, the courts that have decided this after those 2007 proposed rules came out have all deferred to it, including, Your Honors, a panel of the Ninth Circuit, Judges McKeown, Tallman, and Silverman, who specifically deferred in finding that the rating was unpublished. That's unpublished, isn't it? It is unpublished, Your Honor. But it doesn't – it's the same thing. Why should it bind us? And, Your Honor, I'm not suggesting that it's binding. But rather, as Judge Pregerson stated, these are three justices just like yourselves and they viewed it as – Judges. We're judges. I'm sorry. They're free people. And they're not like us. Fair enough, Your Honor. But three of your colleagues have already looked at this. And in addition, as has already been referred to, there are ten district court decisions. And I understand that that's not binding. But I would hazard to say that even with your collective years on the bench, it cannot be very often that a case comes before you where there are ten cases all brought by the same appellant's counsel, all challenging the exact same practice. Every single one of them has been dismissed. Six of those district courts considered this exact TILA case, as well as the panel of the Ninth Circuit that issued that unpublished memorandum disposition. So to the extent that there's any doubt as to whether or not the commentary applies here, then the Federal Reserve Board's recent interpretation is – Well, isn't it a little crazy? You get someone that you encourage to sign up with Chase. Apparently, I don't know how they decide who they send these cards out to. And then the person is having problems making their payments. So what you then do is start raising their rates. And then they're supposed to know that in the fine print there that the farther behind they get, and the longer that goes on, the more expensive it's going to get for them. And then if they decide to go into bankruptcy, then there's some limitations on that. So is that good for the country? Your Honor, I would go back to exactly the point that you made earlier, which is Chase targets the people who default to increase their interest rate to protect itself from the risk that they won't pay their credit card, because Chase is – But Chase factors all that in right at the beginning. And, in fact, it doesn't, precisely for the reason you said, which is – How do I know that? Your Honor, of course, it's not in the record. But in answering your question, the whole point of risk-based pricing, which is what's being challenged here, is that Chase, because it's unsecured lending, has nothing to go against when people stop paying. And so if they couldn't increase the interest rates for the people who do default, who are an increased risk of not paying, they'd have to increase everybody's interest rate ab initio to protect for that risk. So here – But we don't know what the formula is, and the consumer doesn't know what the formula is. And, Your Honor, you keep referring to that formula, and I would just refer back to our papers where we say, number one, it's not properly before the record here. And even if it were, the formula is only how it is that Chase decides to forego its contractually – Why does that have to be secret? Your Honor, it's not that it's secret, but if you – the declaration sets out in about five or six pages how complicated the formula is, because what Chase does is tries to get a complete financial picture of the person to decide whether or not there's an increased risk of default. But I still want to go back to the primary point here, which is it's not properly in the record on – Well, the public's not smart enough to figure that out, huh? Your Honor, having seen some of the complicated math that goes into that formula, I can frankly say I'm not smart enough whether or not the public is. But bringing it back to where we are, the Board is currently considering whether – In other words, Chase is like a sovereign. We can do no wrong and trust me. I don't agree with that, Your Honor. I don't think that that's what the record shows here. But the Board is a sovereign, and we know that. And the Board, the Federal Reserve Board, is currently deciding whether or not this kind of notice should be required. And the Board hasn't decided yet. And with all due respect to Your Honors, the things we do know – They're talking about, what, 45 days' notice now, aren't they? They are exactly, Your Honor. And they're talking about requiring the notice regardless of whether the But they haven't decided. And the current regulations that apply here, they've made it very clear, do not require the notice that appellant seeks. Where do they say that? Where do they say that, Your Honor? Cited in our papers, I can quote that to you, where they say, for example, some credit card account agreements permit the card issuer to increase the periodic rate if the consumer makes a late payment because the circumstances of the increase are specified in advance in the account agreement. The creditor currently need not provide a change in terms notice. That's where they state that. And there are other places I could quote as well, where they state that a discretionary interest rate increase where the triggering event is set forth in the card member agreement does not currently require notice. Okay. The board apparently instigated this. They're part of the proceeding before these lawsuits were decided, though, I guess. That's right, Your Honor. They did, although they still have not reached a decision whether or not this notice should be required. How do the usury laws fit at all? The way the usury laws fit is under the National Bank Act. National banks can export the rate of interest that's authorized in their home state. And here, as I had said, in Delaware, the usury law provides that Chase or any bank may charge the interest rates that are set forth in its card member agreement, which is exactly what happened here. Yeah, you know, I kind of was interested in this and had my law clerk give me some information on the usury laws. And there's some very interesting stuff here and history of it. And the prophet Ezekiel said, list usury in a list of abominable things, along with rape, murder, robbery, idolatry. And then if you want to go back to the intent of the signers of the Constitution in 1776, all of the states in the Union adopt general usury. Most states set the interest limit at 6%. You know, that's what the framers had in mind. And there was something else I saw here. Something about, you know, Dante's, yeah, Dante pens in the Inferno in which he places usurers at the lowest ledge in the seventh circle of hell. I've got to read that. And lower than murderers. So, you know, it's an interesting history. But it's good to know all this, you know. You've got to have a historical scope when you look at these things. You'd agree to that, wouldn't you? I would, Your Honor. And I'm glad to say that usury is not an issue in this case. All right. Thank you. Okay. Very interesting, Your Honor. You asked a question in regards to the rate of interest for Mr. McCoy. You got a sort of fudgy answer. But the bottom line of the answer was it is in the record. And his rate is stated as being up to, I think it's around 30%, or whatever the agreement stated. I read right from it. But it has the maximum rate up to. So Mr. McCoy doesn't know that he's going to get a rate increase. And he doesn't know how much his rate's going to be. Now, telling you up to, she admitted it, it tells you up to, that doesn't give you the maximum. When you get that credit card offer, it says up to $50,000. The up to is in small print. But I can assure you it doesn't say you will get $50,000. It will be anywhere up to $50,000. And unless your credit's really good, it'll probably come out less. The rules at issue and the disclosure requirements as they affect this case only come into play in the event of default? Correct. The disclosure rules cover both default and non-default. If it's non-default, it's 15 days. You need 15 days in advance. If it's a default, they give a break to the credit card company and say you can do it right up to the time of that default. And in fact, Chase mentioned somewhere where they mentioned one of the rules that says if you default, we can apply, immediately apply the higher rate. But it doesn't say you can retroactively apply it. It doesn't say that you can go back a month. You've answered my question. Okay, sure. Let me discuss briefly what that public comment is about. Because so many people were upset with these rate increases, and it caused a storm, especially because they were backdating them. They were basing it on defaults with some other creditor. You didn't pay your phone bill instead of your rate could be 30%. Because they said they called it universal default. So there were various congressional hearings, and the Federal Reserve Board in 2004 puts out what they call the advanced notice of proposed rulemaking. They were looking to change, and now they're proposing to make it instead of zero days' notice or 15 days' notice. They're now looking to change both of those to 45 days' advanced notice. In that first announcement, they mentioned something similar to what they mentioned in 2007. But in 2004, they described the rules now as saying, well, if a credit card company says that we will increase your rates, not we may, but we will, then you don't need to give the 15 days in advance notice. That's what the current regulations say. Come 2007, a different person writes up a description of the existing rules. I'm a conspiratorialist a little bit. I wonder how that got into the proposed regulations. But nonetheless, it's just somebody's dicta in proposed regulations. That has no official status to change the official staff commentary, which is still in effect. It's from 1981. It hasn't changed. And that commentary says that if you're giving a rate increase as a result of a default, then you need to give notice of that. And it doesn't mean you have to. Right. Exactly. But it's not said action yet. It's just a proposed thing. And all that they're citing to, like it's the gospel, is they're citing somebody's comment on what the existing rules state. And they miscited it because what you heard was that under this one bit of dicta, they say, she left out the part that says, if there's a rate increase, you need to give notice. The next line says, however, if it's explained that we're allowed to increase your rates, then you don't need to give a change in terms. It's a little sleight of hand because a change in terms is not the same thing as a change in rates. And I attached to my briefing a bunch of materials where the board, everything, says the difference between a change in terms and a change in rates. And the dicta that they cite, if you read it carefully, it will say, you need to give notice of a rate increase, but you don't need to give notice of a change in terms. What they're saying is you need to give notice of a rate increase, but you don't need a new contract to do it. Okay. I gave you notice, now you got 30 seconds. Okay. Fair enough. And I really appreciate the extra time involved, too. The bottom line is somebody that's three days late. Not only does he, you know, maybe through the post office's delay, he suddenly ends up at 32% interest. He's pretty much out of business. And those credit card companies, to be honest with you, they managed to stick into the bankruptcy code that those rates. That's not before us. That's not before us. We know all these things. Okay. Fair enough. That's the gist of it. There is no specific notice. Sam Conte told us about that. Right. Go ahead. It's in the record before you exactly the notice that my client got, which is if there's a default, we may increase your rates, bottom line, and we may increase it in whatever amount we want. Don't blame the post office. My father was a postman, so he always delivered on time. Okay. Okay. Thank you so much. I really appreciate your time. Yeah, yeah. Be careful with your words. Yes, I promise I will not do that again. I will remember. Yes, be very careful. Yes, okay. Be good, be smart, be careful.
judges: Pregerson, Hawkins, Cudahy